[No. 7789.    Decided March 26, 1909.]

O. P. BURROWS *et al.*, *Respondents*, v. F. F. WILLIAMS *et al.*, *Appellants.*[1]

COMPROMISE AND SETTLEMENT—PAROL EVIDENCE TO VARY WRITING —BURDEN OF PROOF. Parol evidence to overcome the written record of a settlement must be clear, cogent, and convincing.

SAME—EVIDENCE — SUFFICIENCY — RESULTING TRUSTS. Where a partnership or profit-sharing contract was settled by the acceptance of a give or take proposition, and deeds were made to the purchasing partners by the vendor of his interests in such of the real estate as was held partly in his name, there is no clear, cogent, and convincing testimony of an oral agreement to leave out of the settlement certain other tax title lands already held in the name of the purchasers, or to overcome the presumption of a full settlement and show a resulting trust in favor of the vendor, where by his

[1]Reported in 100 Pac. 340.

testimony the vendor claimed that such oral agreement was made because of the expectation of a decision by the supreme court respecting the tax title and the consequent uncertainty as to its value; when in fact the tax deed had just been issued and suit to set it aside was not instituted by the former owners until six months later, after which and about two years later, the supreme court sustained the tax title, and during all that time the purchasers treated the tax title lands as their own and defended the suit at their own expense, the vendor taking no interest therein, and where the two purchasers flatly contradicted the testimony of the vendor.

Appeal from a judgment of the superior court for Chehalis county, Irwin, J., entered June 8, 1908, upon findings in favor of the plaintiffs, in an action to declare a trust and quiet title, after a trial before the court. Reversed.

*John C. Hogan,* for appellants.

*Morgan & Brewer,* for respondents.

Chadwick, J.—On the 21st day of May, 1901, O. P. Burrows was the agent of the owner of certain lands in Chehalis county. Williams & Johnson were engaged as copartners in the logging business, on the Humptulips river. By a previous arrangement Burrows had obtained permission to log the lands belonging to his principal. Burrows was not engaged in the logging business. In order to carry out his purpose and to turn his opportunity into profit for himself, and Williams & Johnson being prompted by a desire to extend their logging operations, the following agreement was entered into:

"This agreement made on this 21st day of May, A. D. 1901, by and between F. F. Williams and C. E. Johnson, copartners in business under the firm name and style of Williams & Johnson, parties of the first part, and O. P. Burrows, of Hoquiam, Washington, party of the second part, witnesseth:

"That the parties hereto have and do hereby agree to log off the merchantable timber in sections three and four in Twp. 18 north of range 11 west of W. M., and sections 27

and 28 in Twp. 19 north of range 11 west of the W. M., as described in logging contract hereunto attached.

"The parties of the first part shall furnish the plant and capital sufficient to carry on said logging operations. Out of the proceeds of the logs sold off said property, shall be paid the stumpage due for the same, and next an amount sufficient to reimburse said parties of the first part for the amount expended by them for plant and wages paid to labor on same, together with interest on such amounts at the rate of ten per centum per annum, all of which shall be considered a first lien on the amounts first received on the logs. The said C. E. Johnson, one of the parties of the first part herein, shall receive as wages for his personal services in running the camp of the parties conducting said operations the sum of —— dollars per month, which sum shall in arriving at the net proceeds of the business be considered as an expense of such operations and rank as labor. The net proceeds of this enterprise shall be divided as follows, to wit: One-third to said party of the second part, and two-thirds to the parties of the first part herein. This agreement shall be binding upon the parties hereto and to each of their heirs, executors, administrators and assigns.

"In witness hereof the parties hereto have hereunto set their hands and seals the day and year first above set forth.

"Williams & Johnson,    (Seal)<br>
"O. P. Burrows,    (Seal)"

Thereafter stumpage contracts were entered into between Hiscock, the owner of the land, and Williams & Johnson, a firm, and O. P. Burrows. Before beginning logging operations on the Hiscock lands, other lands were bought and logged off by the parties. In dealing with the public, no concern was taken of Burrows. All contracts, aside from deeds and stumpage contracts, were made, and the business carried on, in the name of Williams & Johnson. A bank account was carried in the name of Williams & Johnson, which was replenished from time to time by the sale of logs and money borrowed on the individual credit of Williams & Johnson. At the time the contract was entered into, Williams & Johnson had in boom on the Humptulips river

about five million feet of logs. These were also sold and the proceeds turned into the bank. Additional equipment and machinery for logging was purchased from time to time. The parties carried on a logging business under the contract from May 21, 1902, until the 13th day of January, 1903, when the business relations between them ceased. The lower court held, among other things not material to our present inquiry, that:

"The proceeds of logs put in by Williams & Johnson which had come to market under the contract of May 21, 1901, and which proceeds were collected by them and turned into the bank account of Williams & Johnson at the First National Bank, were never sufficient at any time up to January 13, 1903, to reimburse Williams & Johnson for moneys expended and paid out of their individual funds for carrying on such logging operations.

"The total amount deposited in the bank account of Williams & Johnson during the period of May 21, 1901, to January 13, 1903, was made up of the following items:

Cash from Geo. L. Davis loan.........$ 3,257.50
Proceeds of Williams & Johnson notes
　　to the bank for loans..............13,000.00
Grays Harbor Com. Co. check for logs..　854.71
American Mill Co. checks for logs.....15,136.33
Panel Folding & Box Co. for logs.....　450.00
Cash deposits (probably from logs)....　7,004.25
　　　　　　　　　　　　　　　　　　　　　　————————
　　　Total　.......................$40,315.46

"From May 21, 1901, the date of the agreement between Williams and Johnson and O. P. Burrows and up to the transfer from Burrows to Williams & Johnson on January 13, 1903, the proceeds of the sale of logs in which Williams & Johnson and O. P. Burrows were interested, were insufficient to reimburse Williams & Johnson for expenditures made by them in logging said lands and no dividends or profits had ever been declared or divided between Williams & Johnson and O. P. Burrows under the agreement of May 21, 1901."

No profits appearing, and the parties being mutually dissatisfied, after some preliminary negotiations, a give and

take proposition was made by Williams & Johnson, which was accepted by Burrows. He was paid the sum of $3,000 in cash for his one-third interest in the business. Burrows and wife made deeds to Williams & Johnson for a one-third interest in and to all of the real property owned by Burrows and Williams & Johnson in common. At the time the title to all of the land so conveyed stood in the names of the three parties to the contract.

On September 13, 1902, the account of Williams & Johnson was overdrawn at the bank. To cover this overdraft and to create a fund to meet the needs of the business, Williams & Johnson borrowed the sum of $2,000, for which Williams executed a note in the name of Williams & Johnson. On the 20th day of September, 1902, Burrows took out four delinquency tax certificates covering land in Chehalis county, Washington. On September 29, he made an assignment of two of them, covering two hundred and forty acres of land, to F. F. Williams, by which he in terms conveyed all his "right, title and interest of, in and to the within delinquency certificates to F. F. Williams," and in terms authorized "the treasurer of Chehalis county to pay the redemption money therefor or issue a deed for the property therein described to the said F. F. Williams." Burrows paid for the tax certificates the sum of $301.69, out of his own funds. But on September 22, 1902, Williams drew a check upon the account of Williams & Johnson for that amount, in consideration of which Burrows assigned the certificates to him. It was paid out of the credit created by the $2,000 note.

Burrows ordered the deputy prosecuting attorney to attend to the foreclosure of the certificates retained by him, as well as those assigned to Williams, and from time to time manifested an interest in the speedy culmination of these proceedings. He also directed the prosecuting attorney to bid in the lands at tax sale in the name of, and to have the deed executed to, Williams. All expenses of foreclosure, and sale, however, were paid by Williams, probably out of the funds

carried in the name of Williams & Johnson. The tax deed
was issued by the treasurer of Chehalis county on January
3, 1903, ten days before the settlement of January 13, and
was recorded January 19, at the request of George D. Robert-
son, who was acting for Williams. The deed was returned to
Williams when recorded.

This case was brought by Burrows and wife, praying for
a decree establishing a trust in the tax title lands, and pray-
ing that Williams and wife, in whom the record title then
stood, be required to make a deed to an undivided one-third
interest therein. The court below found in favor of Bur-
rows, and defendants have appealed.

It is the theory of respondents that, by reason of the fact
that the money for the tax title lands was paid out of the
funds carried in the name of Williams & Johnson during the
life of the agreement theretofore entered into between the
parties, a trust resulted in their favor. As we have said, a
general settlement was had between the parties to the part-
nership or profit-sharing enterprise (it is not material to de-
cide which it was, although the question is discussed at some
length in the briefs) at which time, in addition to the settle-
ment of the personal estate of the concern, respondent O. P.
Burrows deeded his interest in the land standing in part in
his name to appellants Williams and Johnson. An attorney
was present, and the papers were drawn by him, and pre-
sumably under his direction and advice. The question quite
naturally, occurs why, if the tax title lands were property in
which Burrows and Williams & Johnson each had a one-third
interest, a like deed was not made by Williams to Burrows,
inasmuch as a deed had been issued by the county and was
in the possession of Williams? Respondent O. P. Burrows
says:

"Q. How did you arrive at the basis of three thousand
dollars for your interest? A. Mr. Williams asked me what
I would take for my interest and after considering it for a
few days I made an estimate in a rough way of the logs we

had in the water. We knew the books in the office showed how many logs we sold and that book is not here. I figured up the value of our property and I made him an offer to sell all that we possessed, tax land and all, putting in the tax land at one thousand dollars. At that time my interest in there was five thousand and some odd dollars. I remember that it was a little over five thousand dollars. Mr. Williams said let us take the tax land out of the question as we have nothing to buy or sell there yet; the title is not perfect— some time the supreme court will pass on our tax title and we can settle that afterwards. Q. He mentioned the fact that the case was going to the supreme court and was pending and therefore he was not in a shape to deal? A. I was not in a shape to deal for my interest in the tax land and we agreed to leave the tax land in his name. Q. Until the supreme court had passed on it? A. Until the supreme court had passed on it. He then made me an offer. He made me a give or take offer. He came back at me with an offer outside of the tax lands valuing the property at nine thousand dollars. That would give me three thousand dollars for my interest or make six thousand for theirs. I was not in a position to buy them out in the first place and I was not a logger. I sold to them all my interest with the exception of the interest in the tax lands. It was left in that shape. I trusted him implicitly. I never doubted his word or doubted that my interest was as safe with him as it was with me until he refused to pay me for it on "H" street about the time of the starting of this suit. I never doubted him in any way, and on that day he told me that I did not have any interest in it and I sued him in about twenty minutes after that for my interest. That is as near as I can remember the identical condition of the transaction from start to finish exactly as it occurred. . . .

"Q. And that is the reason you assign that the tax title land was left out of the transaction—the fact that it was in litigation? A. Yes, sir. It had been. No, don't understand me to say that when I sold the tax title land was in litigation. No, sir; I didn't say that. Q. It wasn't? A. No, sir. Mr. Williams held a deed from Chehalis county, a tax deed, that is all we had for it, and the supreme court had not passed on the legality of the deed and Mr. Williams or myself at that time did not know whether we had a deed to a piece of·

land or a deed to an amount of money plus fifteen per cent. Only a short time after that this particular piece of land happened to be taken up to the supreme court. Q. You say that the supreme court was mentioned at that time? A. The supreme court was mentioned—that the title should be settled by the supreme court soon or some time in the future. Q. Was it Williams' intention to take it to the supreme court? A. No. We were waiting simply for some one to settle the tax title. We didn't know that this particular piece of land was going to be the piece that would settle this tax title. This particular piece happened to be the one."

Appellant Williams testified as follows:

"Q. You heard Mr. Burrows' statement that at the time he sold out his interest under that contract of May 21st, 1901, that there was some verbal conversation that he was to reserve his interest in the tax land in order that the matter might be litigated—something of that sort. Was there anything of that sort said? A. There was not. Q. Did Mr. Burrows ever make any claim to this land until he brought the suit? A. He never did until a very few days before he brought this suit. Q. Ever mention it to you? A. Never did. Q. Ever have any conversation with him putting him off? A. No, sir. Q. You heard his conversation to that effect? A. Yes, sir. Q. You did not have anything of the kind? A. No, sir."

It is also insisted by respondent O. P. Burrows that he frequently spoke of the land and his interest in it to the appellant F. F. Williams, between the time of the settlement and the beginning of this action, and that his interest had never at any time, until just prior to the commencement of this action, been denied. On the other hand, both Williams and Johnson testified positively that he never mentioned the matter, and that no notice of his claim was ever brought to either of them until just before the suit was brought.

There is a direct conflict of evidence, but there are two reasons—one of law and the other of fact—that seem to resolve the doubt upon this particular question in favor of

appellants. It is established that evidence to overcome the record of a transaction written by the parties to it, must be clear, cogent, and convincing. The fact which intervenes to bar the theory of respondents is this, that at the time of the settlement, when he says that it was agreed to abide a decision of the supreme court, a tax deed had just been issued, and there is nothing in the record to show that an appeal would ever be prosecuted in the tax foreclosure proceeding, nor had the parties any reason to believe there ever would be. The case referred to in the evidence was the case of *Williams v. Pittock*, 35 Wash. 271, 77 Pac. 385. It was brought here upon appeal from an order sustaining a demurrer to a petition to vacate the tax foreclosure judgment, which was not filed in the lower court until about July 20, 1903, or more than six months after the settlement. The petitioners, the former owners of a part of the property, predicated their right to open the tax foreclosure judgment for alleged irregularities, upon the ground that they knew nothing of the tax proceeding or judgment until July 1, 1903. So far as the parties to this action are concerned, the property was in as good condition for settlement and division then as it ever would be. This being so, we are driven irresistibly to the conclusion, that respondent Burrows is mistaken; that the probable issue of an appeal was not discussed at the settlement, and it was not decided by the parties to allow the tax title lands to remain *in statu quo* in the name of Williams pending the decision of this court. If he did not say at that time what he now says that he said, it is established beyond the peradventure of a doubt that he did not say anything about the tax title lands, and that the settlement was made on the theory that he claimed no interest in them at the time. This conclusion is further sustained by the fact that Burrows took no interest in the appeal. He did not offer, nor did Williams & Johnson ever ask him, to contribute anything toward the payment of the costs and at-

torneys' fees. It also appears that nearly two years elapsed after the decision of this court in the case of *Williams v. Pittock*, before action was begun to recover his alleged interest. The fact that Williams & Johnson during all that time treated the land as their own and made contracts with reference to it, without consulting with or considering Burrows, is a circumstance, the evidence being conflicting, that is entitled to weight. Respondent O. P. Burrows further says, in explanation of the fact that the land now in controversy was not included in the settlement, that he had absolute confidence in Williams, and considered his interest as secure in his name as in his own.

But the fact remains that the parties were engaged in the settlement of the disputed accounts of an unsatisfactory, and according to the findings of the court below, an unprofitable, business venture. There appears to be no reason why the matter should be left as a matter of confidence between the parties. They were engaged in a general settlement, and no attack upon the title was anticipated or threatened. The law raises a strong presumption of fact that when parties are so engaged they will consider and settle every existing difference. "Courts do not encourage the overturning of settlements voluntarily made and long acquiesced in." 8 Cyc. 533. In the case at bar, although in equity respondents may have had (although we do not so decide) an interest in the property, they can only overcome the presumption arising from the settlement, and declare a trust, by testimony so clear and convincing that the court can free the transaction from all doubt as to the intent of the parties. *Spencer v. Terrel*, 17 Wash. 514, 50 Pac. 468; *Burke v. Fuller*, 41 La. Ann. 740, 6 South. 557; *Desha v. Smith*, 20 Ala. 747; *Wells v. Erstein*, 24 La. Ann. 317; *Murray v. Ellston*, 24 N. J. Eq. 310; *Little v. Little*, 2 N. D. 175, 49 N. W. 736; 47 Cent. Dig. § 137; *Peterson v. Martin*, 28 N. C. 111.

The last case cited is in point on a give and take proposi-

tion. A partner made an advance of $808.12 to the firm, taking a note signed by his partner. Upon dissolution no actual account of the note was taken, the partner making the advance agreeing to take a certain amount for his share, the other partner to take all the assets and pay all debts of the firm. The court said:

"Indeed, a state of the firm, if truly made, must have shown this as an outstanding debt, with the others. But nothing of the kind was prepared. It appears, indeed, that an inventory of the debts to the firm and of the other effects, (except the merchandise,) had just been taken; but it is obvious, that was a mere list of debtors, and of the amount of the debts on their face, and it did not ascertain the good and bad debts, and compute the true value. It was not an estimate of the assets of the concern, or an account of the respective partners in company. This is put beyond doubt, by the fact stated in the articles that the goods, in which the plaintiff was, as far as they would go, to be paid the $6,000, had not been inventoried, nor their value determined. No list of the debts, owing by the firm, appears to have been taken. The conclusion, then, seems certain, that this was a bargain for a dissolution without striking a balance, and at a venture on each side. The inference follows, that when the plaintiff took out of the common property $6,000 for his share, it was for his whole share thereof, and not merely for his original stock and a conjectural profit. The memorandum given to the plaintiff by his partner, can make no difference in law. It is only one evidence of the advance, and is no better than an entry in the books to the plaintiff's credit. We suppose that this sum of $808.12 was, of course, to the credit of his account; and the difficulty is to distinguish and say, that the $6,000 did not extinguish that credit, as well as one for the plaintiff's original share of the capital. In fine, when the plaintiff, one of the partners, took a large sum, exceeding all his advances of every sort, and took it without computing either profit or loss, and without saying on what accounts in particular he received it, the legal conclusion must be, that it was meant to cover his entire share, and extinguish every demand he had on the effects of the firm; for one item of his demand can be no more said to survive than

another. Therefore, although third persons might have debts against the firm, the partner, thus provided for on a dissolution, could not be said to have them."

A careful review of the evidence convinces us that respondents have failed to overcome the presumption arising from the settlement had between the parties on January 13, 1903, and for that reason the decree of the lower court should be reversed. This conclusion makes it unnecessary to discuss the other questions suggested in the briefs of counsel. This case is reversed with instructions to the lower court to enter a judgment in favor of appellants.

RUDKIN, C. J., FULLERTON, MOUNT, and CROW, JJ., concur.

DUNBAR and GOSE, JJ., took no part.